# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 OCT 27  PM 12: 18

CLERK

BY

DEPUTY CLERK

**TRAVIS ALLEN,**

and

**JESSICA ALLEN,** as next friend and
mother of minor **BLAKE ALLEN,**

     *Plaintiffs,*

v.

**LAYNE MILLINGTON**, in his official
and personal capacities as
Superintendent of Orange Southwest
School District,

**LISA FLOYD**, in her official and
personal capacities as Co-Principal of
Randolph Union High School,

**CATY SUTTON,** in her official and
personal capacities as Co-Principal of
Randolph Union High School, and

**ORANGE SOUTHWEST SCHOOL
DISTRICT BOARD,**

     *Defendants.*

Civil Action No.: 2:22-cv-197

**JURY TRIAL DEMANDED**

## VERIFIED COMPLAINT

Plaintiffs Travis and Blake Allen, by and through undersigned counsel, for
their Verified Complaint against Defendants, hereby state and allege as follows:

1

**INTRODUCTION**

1.      Travis Allen and his fourteen-year-old daughter, Blake, were punished for expressing their views on a matter of profound public concern: whether a teenage male who identifies as female should be permitted to change in a girls' locker room regardless of the discomfort experienced by girls in that room.  In objecting to a male being in the room while the girls are changing, Travis and Blake each made comments underscoring that the trans-identifying student is in fact a male, including by using male pronouns.   Indeed, their view of the student's maleness was foundational to their opinions on appropriate use of the locker room.  Yet, their remarks were too much for Defendants' transgender orthodoxy—Travis was deemed to have "misgendered" the student, while Blake was found guilty of "harassment" and "bullying"—so Defendants disciplined both of them.

2.      But Defendants are state actors and violate the First Amendment when they attempt to dictate what may be said on matters of public concern.  And they cannot discriminate against speech on the basis of its viewpoint.  Yet, that is exactly what happened here.  Defendants punished Travis and Blake for saying that a male is a male, as a matter of sex and biology, regardless of the gender identity that the male has assumed.

3.      The locker room controversy presented itself in the Orange Southwest School District ("OSSD") on September 21, 2022, when a 14-year-old biological male on the Randolph Union High School ("RUHS") girls' volleyball team—here called "T.S."—entered the girls' locker room while the girls were changing.  Having never been warned of the possibility of this encounter by RUHS, multiple girls in the locker room, including Blake, became upset; and multiple parents, including Blake's mother, Jessica, called the RUHS co-principals' office to object.

4.      Blake expressed her views on the subject the next day, when a few students discussed it with her in French class—a class T.S. does not attend.

2

Explaining that T.S. "literally is a dude," she opined "he does not belong in the girls' locker room." As a result of these comments, Defendants took disciplinary action against Blake, finding that her reference to T.S. as a male constituted "harassment on the basis of gender identity."

5.     But punishing Blake for expressing a dissident view was not enough; Defendants also seek to coerce her to agree with their transgender dogma. In addition to giving Blake two days' out-of-school suspension, Defendants are requiring her to "[t]ake part in a restorative circle with . . . our Equity Coordinator and at least two students who can help her understand the rights of students to access public accommodations . . . in a manner consistent with their gender identity," and "submit a reflective essay." Defendants intend to render their own judgment on this reflective essay; and if they deem it "lacking good faith," Blake will be required to serve an additional three days' out-of-school suspension. Meanwhile, Defendants took no action at all against T.S.—who said, during math class the week after entering the girls' locker room, "I'm going to f***ing kill Blake Allen."

6.     Travis expressed his views on the locker-room issue outside of school soon after hearing about the threat that T.S. had made against his daughter. In a Facebook post that evening, a user identifying herself as the "mother of the trans student in question" claimed "[Blake] made up the story for attention" and that "truth will prevail." Travis responded, "the truth is your son watched my daughter and multiple other girls change in the locker room. While he got a free show, they got violated." Defendant Millington, OSSD's Superintendent, found that this post "misgendered a transgender student" and suspended Travis from his job as middle school girls' soccer coach without pay for the rest of the season.

7.     The First Amendment does not countenance this kind of government censorship, where a public school mandates that students and coaches refrain from expressing any view that offends its prescribed views, particularly on an issue as

3

important as whether the school should permit males identifying as girls to undress, shower and change in the girls' locker room.  Travis and Blake Allen were entitled to express their views on that issue and, in expressing those views, to support them with what is a biological fact—that a biological teenage male is, indeed, a male.  This case presents a textbook example of unconstitutional viewpoint discrimination, and Plaintiffs are entitled to all appropriate relief.

## JURISDICTION & VENUE

8.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

9.     This Court has subject-matter jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

10.     This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343, the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02, the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65, and costs and attorneys' fees under 42 U.S.C. § 1988.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and all of the events or omissions giving rise to the claims alleged in the Complaint occurred in this district.

## THE PARTIES

12.     Plaintiff Travis Allen resides in Orange County, Vermont. He and his wife, Jessica, have four children.  Three of their children, including Blake, are in the Orange Southwest School District ("OSSD").

4

13.     Plaintiff Blake Allen, bringing this action by and through her next friend and mother, Jessica Allen, resides with her family in Orange County, Vermont. She is in the ninth grade at Randolph Union High School ("RUHS").

14.     Defendant Layne Millington is and was at all relevant times the Superintendent of OSSD. He resides in Orange County, Vermont.

15.     As superintendent, Defendant Millington is the "chief executive officer" of OSSD. Vt. Stat. Ann. tit. 16, § 11(a)(13).

16.     As superintendent, Defendant Millington has ultimate authority over coaches employed by OSSD, including the power to suspend or terminate coaches, as exercised against Plaintiff Travis Allen.

17.     Defendant Lisa Floyd is and was at all relevant times the Co-Principal of RUHS in OSSD. She resides in Windsor County, Vermont.

18.     Defendant Caty Sutton is and was at all relevant times the Co-Principal of RUHS in OSSD. She resides in Washington County, Vermont.

19.     Defendants Millington, Floyd, and Sutton, as the superintendent and principals, have the authority to "suspend a student for up to 10 school days," Vt. Stat. Ann. tit. 16, § 1162(a), and exercised that authority against Blake Allen.

20.     Defendant Orange Southwest School District Board ("OSSD Board") is and was at all relevant times the body governing schools within OSSD, and its headquarters are located in Orange County, Vermont.

21.     Defendant OSSD Board has authority to enact policies governing administration of schools within OSSD, which include the policies challenged here, and directing action of the OSSD Superintendent and OSSD school administrators, including the actions taken against Plaintiffs.

22.     RUHS consists of both a high school and middle school.

23.     At all times relevant to this Complaint, and for each act or omission alleged herein, Defendants were acting under color of a statute, regulation, or custom of the State of Vermont (i.e., under color of state law and authority).

## FACTUAL ALLEGATIONS

**A. The Allen Family Actively Supports the Orange Southwest School District and Randolph Union High School.**

24.     Travis and Jessica Allen purchased a home in Randolph Center, Vermont in August 2017, and their four children, including Blake, began attending public schools in the Orange Southwest School District ("OSSD"). They currently have three children enrolled in Randolph Union High School ("RUHS").

25.     Over the past 5 years, Travis has been heavily involved in OSSD and RUHS sports and other activities. At various times, he coached the RUHS middle school boys' basketball team, the RUHS varsity boys' baseball team, and the RUHS junior varsity girls' basketball team. He has served as the timekeeper for RUHS girls' volleyball. And he currently serves as senior-project panelist for four unrelated seniors in the RUHS senior program. He also currently serves as a referee for high-school and middle-school basketball games employed by the International Association for the Appointment of Basketball Officials (Vermont chapter).

26.     Also, for the past two years—until he was suspended on October 18, 2022, Travis served as the RUHS middle school girls' soccer coach. His duties in that regard included preparing the players for competitive play, ensuring they were fit to participate, and managing the team's participation in both practices and competition.

27.     Travis signed a contract to coach for the Fall 2021 season and was paid roughly $1,200 for his coaching that season.

28.     Travis's contract was renewed for the Fall 2022 season, and he was promised roughly $1,900 for the season.

29.    If Travis had not been suspended, his contract to coach middle school girls' soccer would have been automatically renewed for the Fall 2023 season.

30.    During the two years that Travis coached RUHS middle school girls' soccer, Travis increased participation on team.  After he was terminated, the players expressed their appreciation for Travis's coaching efforts by sending him a video showing their individual remarks of thanks and praise.

31.    Jessica also has been heavily involved with OSSD and RUHS sports and other activities.  She was active in the RUHS sports boosters, serving as its president from Fall 2020 through Spring 2021.  She is on the board of Friends of Shizukuishi, a student-exchange program in which RUHS middle school students travel to Shizukuishi, Japan.  And, like Travis, she advises unrelated seniors with their senior projects in the RUHS senior program—something she has done for the past three years.

32.    Like her parents, Blake is active in school sports.  She plays RUHS volleyball and softball and participated in middle school gymnastics.

## B. A Locker-Room Controversy Erupts.

33.    There is one girls' locker room at RUHS.  It does not provide separate or private changing areas.  It contains two long wooden benches and numerous lockers in one common changing area that is separated from a toilet/shower area (with a single bathroom stall) by an open partition.  Photographs of the RUHS girls' locker room are attached hereto as Exhibit 1.

34.    During the 2021-22 school year, Defendants Floyd and Sutton received multiple complaints that two males at RUHS who identified as female were using the girls' locker room and restrooms in a manner that made certain girls feel uncomfortable.

7

35. T.S.—a teenage male who identifies as a female and is now in the ninth grade at RUHS—was one of the subjects of those prior complaints.

36. In the 2022-23 school year, T.S. joined the RUHS girls' volleyball team.

37. Before September 21, 2022, RUHS provided no notice to members of the girls' volleyball team or their parents that it would be school policy to permit T.S. or a trans-identifying male to use the girls' locker room, including while girls in the locker room were in a state of undress or showering, and that T.S. or a trans-identifying male would be permitted to undress and shower at the same time as the girls.

38. Before September 21, 2022, T.S. had not entered the girls' locker room while members of the girls' volleyball team were using it.

39. On September 21, 2022, the girls' volleyball team played an away game at St. Johnsbury Academy in St. Johnsbury, Vermont. Prior to leaving for the game, many members of the team went to the RUHS girls' locker room to change into their sportswear and uniforms.

40. While numerous girls on the volleyball team were using the girls' locker room, T.S. entered the locker room. When T.S. entered, girls in the locker room were in various states of undress, with some shirtless or without pants.

41. Immediately upon seeing T.S., Blake and other girls told or asked T.S. to leave the locker room but T.S. proceeded into the room and walked to the separately partitioned toilet/shower area.

42. T.S.'s presence in the girls' locker room while the girls were in the middle of changing and some were in a state of undress was upsetting to a number of girls on the volleyball team, including Blake.

43. Shortly after, T.S. looked out into the main area, asked the girls "are we still changing?" and remained in a position to observe them while they continued to change.

8

44.     Blake gestured for T.S. to move back behind the partition.

45.     When T.S. did not move back behind the partition and continued to watch the girls changing, Blake left the girls' locker room upset and called her mother Jessica.

46.     Blake's mother called the school office to complain about T.S.'s presence in the girls' locker room while the girls were changing.

47.     Other parents also contacted the school office to complain about T.S.'s presence in the girls' locker room while the girls were changing.

48.     RUHS made no attempt to ensure the girls felt safe or provide them with any kind of support or counseling.

49.     Defendants Floyd and Sutton told the girls' volleyball team and their families that "under state law" T.S. could use the girls' locker room even while girls were undressing or showering, and that if any girls felt uncomfortable, they should use one of the single-stall restrooms outside of the locker room.

50.     Vermont law does not require RUHS to allow T.S. to use the girls' locker room while girls are using it.   Rather, use of locker rooms by trans-identifying students, according to the Vermont Agency of Education, "requires school to consider numerous factors," including "protecting student privacy."   A copy of the Agency's "Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students" is attached hereto as Exhibit 2.

51.     There are only two single-stall restrooms outside the locker room; they do not have shower or locker facilities; and they were out of commission at the time of the events at issue due to vandalism.

52.     Two days after the game against St. Johnsbury Academy, Blake and some other girls on the volleyball team needed to change for a home game against Montpelier. Because of Floyd's and Sutton's decision to permit T.S. to use the girls' locker room, the girls decided not to use the girls' locker room. Instead, they asked a

male friend to check the nearby boys' locker room to see if it was being used. When they were advised there was no one in the boys' locker room, they proceed to change in that empty locker room.

53.     The next day, Defendant Floyd told Blake that she and the other girls on the volleyball team were not permitted to use the boys' locker room unless they identified as male, adding "I don't see Blake Allen identifying as a male anytime soon."

## C. Blake Expresses Her Views on the Locker-Room Issue, and RUHS Begins an Investigation.

54.     On Thursday, September 22, the day after Blake left the girls' locker room upset that T.S. was there, Blake discussed T.S.'s use of that locker room with three classmates sitting adjacent to her in French class—a class that T.S. is not in. The discussion was brief—lasting roughly 1 or 2 minutes—and ended when the teacher told the four students to get back to work.

55.     In the discussion, Blake and her classmates exchanged various points of view on the locker room issue. In expressing her views, Blake explained that T.S. "literally is a dude" and opined "he does not belong in the girls' locker room." One student disagreed, opining "no one should care" whether T.S. uses the girls' locker room.

56.     A student in the class who was not part of the conversation but overheard it reported Blake's comments to the co-principals' office.

57.     The next day, Friday, September 23, Defendants Floyd and Sutton called Jessica Allen while she was at work to tell her they had received information that Blake may have inappropriately "misgendered" a student in certain comments made at school. They told Jessica RUHS was opening a harassment, hazing and bullying ("HHB") investigation pursuant to the HHB Policy.

58. The HHB Policy was enacted by the OSSD Board as Board Policy C10: Prevention of Harassment, Hazing and Bullying (Policy) and C10-P: Prevention of Harassment, Hazing and Bullying (Procedures). A complete copy of OSSD Board Policies C10 and C10-P (collectively, "HHB Policy") is attached hereto as Exhibit 3.

59. During the HHB investigation, Defendant Floyd told Blake, "I think we all know this is referring to the situation in French class."

60. The school's HHB investigation of Blake focused on what she said in French class, with the investigators interviewing all three students who had talked with Blake about the locker room issue in French class as well as Blake's French teacher.

61. On information and belief, the French teacher told the HHB investigators that she didn't really recall the remarks made by Blake or the other students during their conversation and simply told them to get back to work.

## D. The Girls' Volleyball Team is Banned from the Locker Room, and the Locker-Room Controversy Becomes News.

62. Doubling down on their reaction to Blake's speech, on Tuesday, September 27, Defendants Floyd and Sutton banned the girls' volleyball team from using the girls' locker room. A copy of the notice of this ban sent to the volleyball families is attached hereto as Exhibit 4.

63. The irony of the school's decision to ban the girls' volleyball team from the girls' locker room in response to concern that males should not be using the girls' locker room sparked media attention.

64. On Wednesday, September 28, a news team from WCAX-TV in Burlington, Vermont, showed up at RUHS and asked students to speak with them about the issue.

11

65.     Blake spoke with the WCAX-TV news team about the issue.  In the resulting story, *"Randolph High School investigating gender locker room dispute,"* published on September 28, Blake was quoted as saying, "I feel like for stating my opinion—that I don't want a biological male changing with me—that I should not have harassment or bullying charges.  They should all be dropped."  She was also quoted as saying: "They want all the girls who feel uncomfortable—so pretty much 10 girls—to get changed in a single stall bathroom, which would take over 30 minutes.  Where if one person got changed separately, it would take a minute, like no extra time."  A copy of the WCAX-TV news story (no longer available on the WCAX-TV website[1]) is attached hereto as Exhibit 5.

66.     WCAX-TV also reported that Blake said T.S. made an "inappropriate comment" while members of the girls' volleyball team were getting changed.  Although Blake made a comment in that regard, she was referring to an incident involving two other RUHS girls that occurred with T.S. the year before.

67.     The prior incident occurred in the 2021-22 school year, when T.S. was in the girls' locker room with two girls and said, "my male instincts are kicking in."  This comment upset both girls so much that they each reported the incident to the co-principals' office after it occurred.

68.     Upon information and belief, the co-principals dismissed the girls' complaints and took no action against T.S.

---

[1] WCAX-TV took the story down, with its news director explaining it did so "to prevent others from using our reporting to attack people in the transgender community." A. Novak, *WCAX Deletes Story About Transgender Student in Randolph* (Oct. 11, 2022) https://www.sevendaysvt.com/vermont/wcax-deletes-story-about-transgender-student-in-randolph/Content?oid=36681380

**E. T.S. Threatens to Kill Blake.**

69.     On September 29, after the WCAX-TV news story was published, T.S. told other students in math class, "I am going to f\*\*\*ing kill Blake Allen." One of the students who heard T.S. make this threat told Blake about it.

70.     On September 29, Blake and the student who had heard T.S. make the threat reported T.S.'s threat to Defendants Floyd and Sutton.

71.     Although RUHS has a threat assessment protocol, Defendants Floyd and Sutton waited until the day after the threat was made to conduct any threat assessment—notwithstanding the fact, which they knew, that Blake and T.S. ride the same bus to and from school.

72.     Upon assessing the threat, Defendants Floyd and Sutton deemed the threat to be low-risk and dismissed Blake's and the other student's complaint.

73.     On September 29, Jessica Allen asked Defendants Floyd and Sutton for a copy of the school's threat assessment protocol, but Defendant Millington refused to provide it, claiming it was confidential. A copy of Millington's email to Ms. Allen is attached hereto as Exhibit 6.

74.     No action was taken against T.S. for threatening to kill Blake.

75.     T.S. made an additional threat against Blake and other members of the girls' volleyball team during a volleyball team bake sale on October 6, saying "I'm gonna f\*\*\*ing kill somebody. They're all d\*\*\*heads." That threat was reported to the RUHS athletic director, but no action was taken.

**F. OSSD and RUHS Suspend Travis for Expressing His Views.**

76.     WCAX-TV published the RUHS locker room story on its Facebook page, and the story garnered significant public attention.

77.     On Thursday, September 29, a Facebook user identifying as "the mother of the trans student in question" claimed "my daughter did not make any comments

13

at all." T.S.'s mother further claimed Blake "made up the story for attention," and said "[t]his is slander, defamation of character, and we have secured a lawyer." The complete post is attached hereto as Exhibit 7.

78.    Two hours later, in response to T.S.'s mother's post, Travis posted that he was the "the father of the girl you claim 'made up a story for attention.'" He wrote "the truth is your son watched my daughter and multiple other girls change in the locker room. While he got a free show, they got violated." Travis's complete post is attached hereto as Exhibit 8.

79.    When he made his September 29 Facebook post, Travis was home and not performing any coaching duties.

80.    On October 5, Defendants Floyd and Sutton met with Travis to ask him about his September 29 Facebook post. Travis acknowledged he wrote the post. Floyd and Sutton told Travis that the RUHS Ethics Agreement for Coaches ("Ethics Agreement") does not allow him to "misgender" any child and that his September 29 Facebook post did just that, by referring to T.S. as "he."

81.    On October 4, the day before he met with Defendants Floyd and Sutton, Travis was asked by the RUHS Athletic Director to sign the Ethics Agreement. In that agreement, Travis agreed to uphold a set of ten core coaching beliefs designed to underscore a coach's role "as a model in the education of the student athlete." A copy of the Ethics Agreement is attached hereto as Exhibit 9.

82.    Defendants had Travis sign the Ethics Agreement after he made the Facebook comments, and then applied it retroactively to punish him under it.

83.    On October 11, Defendant Millington held an Open Forum for the OSSD community to address the locker-room controversy. Travis spoke at the Open Forum, publicly telling Blake he was proud of her and adding, "You should not have to change in front of male students, just the same they should not be changing in front of you.

14

I applaud you for challenging authority that this is wrong and needs not to happen." The members of the OSSD Board were in attendance at this Open Forum.

84.    On October 12, Travis spoke at the OSSD Board meeting, commenting his daughter "has not felt safe" at RUHS because "she had someone in the locker room watching her that was the opposite sex" and reported it, but "nothing happened," and "this kid has made death threats, multiple times, [but] they've been deemed low." He suggested that the Board use some of last year's budget surplus to install separate changing stalls in the locker room.

85.    On October 18, Defendant Millington met with Travis, told him that his September 29 post undermined public trust, and asked Travis what he could do to earn back public trust.

86.    Travis responded that he would be willing to take down the Facebook post and refrain from using gendered pronouns when referring to students who identify as transgender.

87.    Defendant Millington told Travis those measures would not be sufficient and that he would have to issue a public apology to continue coaching at RUHS.

88.    Travis told Millington he could not issue a public apology for his September 29 post. While he considered apologizing so that he could continue coaching his youngest daughter's soccer team, he concluded it was more important to stand up for what he believes: that there are differences between girls and males identifying as girls, and those differences matter when it comes to determining the appropriate use of locker rooms.

89.    He did not apologize, so Millington suspended Travis from his job as RUHS middle school girls' soccer coach without pay for the rest of the season.

90.    Upon information and belief, the OSSD Board knew about and approved Millington's suspension of Travis and also that Travis would be required to issue a public apology to retain or be reinstated to his coaching position.

91.     In a follow-up confirmation of Travis's suspension, Millington stated that Travis was suspended immediately without pay for the rest of the season because his September 29 post had "misgendered a transgender student in our district." A copy of Millington's written confirmation of Travis's suspension is attached hereto as Exhibit 10.

92.     Although Millington's suspension letter to Travis mentioned "public postings and comments you made," the only public posting or comment Travis made about T.S. was his single September 29 Facebook post.

93.     Defendant Millington advised Travis that his suspension would end immediately if he publicly apologized for making his September 29 post.

94.     Travis does not have any players who identify as transgender on the girls' soccer team that he coaches.

95.     Travis has never directly interacted with T.S.

96.     T.S. does not play on the middle school girls' soccer team.

97.     Because T.S. is in high school, T.S. cannot play on the middle school girls' soccer team.

98.     Travis's Facebook post did not interfere with his duties as a middle school soccer coach or his other duties at RUHS.

99.     Travis does not have any policymaking or discretionary role within RUHS or OSSD.

100.    While working at RUHS, Travis has had respectful interactions and relationships with all of his colleagues.

101.    While working at RUHS, Travis has had only respectful interactions with the students he coaches and supervises and their parents.

102.    While working at RUHS, Travis never faced any allegations of misconduct or discipline as a result of his coaching.

16

103. Defendant Millington did not base his suspension of Travis on any actions he took in his capacity as RUHS middle school girls' soccer coach or any interactions he had with any student athlete whom he coached.

104. As a result of his suspension, Travis was prohibited from coaching the soccer team for the remainder of the 2022 season.

105. As a result of his suspension, Travis's contract as girls' soccer coach for 2023 will not be renewed.

106. Upon information and belief, as a result of his suspension, Travis will not be able to coach any other sports at RUHS, which he otherwise would have done, including middle school girls' basketball in the upcoming Spring 2023 season.

**G. OSSD and RUHS Punish Blake for Expressing Her Views.**

107. RUHS completed its HHB investigation of Blake by October 14.

108. The HHB Policy requires Defendants to offer Blake "the opportunity to present witnesses and other evidence during an investigation." Exhibit 3, at § III.E.

109. Defendants never provided Blake with an opportunity to present evidence or otherwise defend herself during the course of the investigation.

110. For unknown reasons, Defendants Floyd and Sutton waited until October 21 to notify Blake, Travis and Jessica of the results of the investigation.

111. Defendants Floyd and Sutton knew that Blake and T.S. would be playing together in multiple girls' volleyball games between October 14 and October 21 but did not notify Blake of the discipline they decided to impose until October 21. T.S. continued to attend school and play in volleyball games with Blake throughout Defendants' investigation.

112. In their October 21 notification, Defendants Floyd and Sutton informed Blake and her family that Blake was found to have violated the HHB Policy by "engag[ing] in verbal and physical conduct directed at a student on the basis of the

17

targeted student's gender identity." A complete copy of this October 21 notification is attached hereto as Exhibit 11.

113.    The October 21 notification further advised Blake and her family that because of her violation of the HHB Policy, Blake would be required to serve a two-day out-of-school suspension.

114.    In addition to the two-day out-of-school suspension, the October 21 notification advised Blake and her family that Blake would be required to "[t]ake part in a restorative circle with . . . our Equity Coordinator and at least two students who can help her understand the rights of students to access public accommodations . . . in a manner consistent with their gender identity" and "submit a reflective essay."

115.    Defendants intend to render their own judgment on this reflective essay; and if they deem it "lacking good faith," Blake will be required to serve an additional three days' out-of-school suspension.

116.    No physical contact ever occurred between Blake and T.S.

117.    The school disciplined Blake exclusively because of the viewpoints she expressed during the French class discussion.

118.    Defendants' punishment of Travis and Blake have deterred others in the OSSD community from expressing their views regarding males who identify as female using the girls' locker room and regarding gender identity in general. Blake knows many other students at RUHS and a number of other players on the volleyball team who do not agree that males should be able to use the girls' locker room, but who are too afraid to voice their views given Defendants' punishment of her and Travis. Similarly, Travis knows a number of members in the OSSD community who share his views on gender identity and locker room usage but will not express those views because they fear they will be accused of "misgendering" and adversely affected.

119.    The school did not take any disciplinary action against the other student participating in the French class discussion who expressed a different viewpoint.

## FIRST CAUSE OF ACTION
## RETALIATION FOR PLAINTIFFS' EXERCISE OF THEIR RIGHT TO FREE SPEECH (42 U.S.C. § 1983)

120.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 119 of this Complaint.

121.   Travis Allen and Blake Allen have rights under the First and Fourteenth Amendments of the U.S. Constitution to express their views on the appropriateness of a teenage male undressing, showering, and changing with teenage girls in a girls' locker room, and in so doing to refer to the male as a male and using male pronouns.

122.   By expressing such views, Travis Allen and Blake Allen were engaged in constitutionally protected activity.

123.   Defendants took adverse action against Travis Allen by suspending him without pay from his position as coach of the middle school girls' soccer team.

124.   Defendants took adverse action against Blake Allen by imposing disciplinary sanctions on her.

125.   Defendants' adverse actions against Travis Allen and Blake Allen were motivated and substantially caused by the exercise of their right to engage in constitutionally protected activity, including the right to express views on the appropriateness of a teenage male undressing, showering, and changing with teenage girls in a girls' locker room, and in so doing to refer to the male as male and using male pronouns.

126.   Defendants would not have taken adverse action against Travis Allen and Blake Allen absent their expression of these constitutionally protected views.

127.   By taking adverse action against Travis Allen and Blake Allen for expressing their views, Defendants unlawfully retaliated against them for exercising their constitutional rights of free speech.

128.    Defendants' adverse actions against Travis Allen were sufficient to deter a person of ordinary firmness from exercising his constitutional rights and thus effectively chilled the exercise of Travis Allen's constitutional rights.

129.    Defendants' adverse actions against Blake Allen were sufficient to deter a person of ordinary firmness from exercising her constitutional rights and thus effectively chilled the exercise of Blake Allen's constitutional rights.

130.    Travis Allen spoke as a private citizen on a matter of public concern.

131.    Travis Allen's and Blake Allen's expression of their views on the appropriateness of a teenage male undressing, showering, and changing with teenage girls in a girls' locker room, reference to the male as a male, and use of male pronouns have not prevented Defendants from efficiently providing services to the public (or even threatened to).

132.    Travis Allen's and Blake Allen's interest in expressing their views on the appropriateness of a teenage male undressing, showering, and changing with teenage girls in a girls' locker room, referring to the male as a male, and using male pronouns outweighs any interest of Defendants in suppressing those views.

133.    Defendants' actions caused injury to Travis Allen and Blake Allen, including depriving them of constitutional rights, loss of income, loss of reputation, and pain, suffering, and emotional distress.

## SECOND CAUSE OF ACTION
## UNCONSTITUTIONAL CONTENT/VIEWPOINT DISCRIMINATION AND COMPELLED SPEECH (42 U.S.C. § 1983)

134.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 119 of this Complaint.

135.    Plaintiffs' views on the appropriateness of a teenage male undressing, showering, and changing with teenage girls in a girls' locker room, speech referring to the male as a male, and use of male pronouns are protected by the First and

Fourteenth Amendments of the U.S. Constitution.

136.    Defendants suspended Travis Allen without pay from his coaching position for expressing those protected views.

137.    Defendants imposed disciplinary sanctions on Blake Allen for expressing those protected views.

138.    Defendants did not take any disciplinary action against coaches or students who took views opposite of Plaintiffs, including those who support the ability of a teenage male who identifies as a female to use the girls' locker room and those who refer to a teenage girl as a girl or female or use different pronouns.

139.    The adverse actions taken against Plaintiffs for expressing these protected views did not advance a compelling state interest.

140.    The adverse actions taken against Plaintiffs for expressing these protected views were not narrowly tailored to advance a compelling state interest.

141.    The adverse actions taken against Plaintiffs for expressing these protected views cannot survive strict scrutiny.

142.    By taking adverse action against Travis Allen and Blake Allen for expressing their protected views, including their reference to a male as a male and use of male pronouns, Defendants have engaged in content and/or viewpoint discrimination in violation of the First and Fourteenth Amendments.

143.    The HHB Policy that Defendants used to punish Blake Allen for her protected speech is unconstitutional on its face and as applied under the First Amendment's Free Speech Clause.

144.    By requiring Travis Allen to issue a public apology for his September 29 Facebook post as a condition to be reinstated as a coach, Defendants are seeking to compel him to speak in violation of the First and Fourteenth Amendments.

145.    By requiring Blake Allen to take part in a "restorative circle" to help her "understand the rights of students to access public accommodations . . . in a manner

21

consistent with their gender identity" and "submit a reflective essay" that meets Defendants' own standards in order to avoid additional out-of-school suspension, Defendants are seeking to compel her to speak in violation of the First and Fourteenth Amendments.

146. Defendants' actions caused injury to Plaintiffs, including depriving them of their constitutional rights, loss of income, loss of future income, loss of reputation, and pain, suffering, and emotional distress.

### THIRD CAUSE OF ACTION
### VIOLATION OF BLAKE ALLEN'S
### RIGHT TO DUE PROCESS (42 U.S.C. § 1983)

147. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 119 of this Complaint.

148. By disciplining her under vague policies, Defendants violated Blake Allen's right to due process of law under the Fourteenth Amendment of the U.S. Constitution.

149. Blake Allen's views on the appropriateness of a teenage male undressing, showering, and changing with teenage girls in a girls' locker room, speech referring to the male as a male, and use of male pronouns are protected by the First and Fourteenth Amendments of the U.S. Constitution.

150. By accusing her harassment and bullying for allegedly violating the HHB Policy, Defendants punished Blake Allen for engaging in expression that the First Amendment protects.

151. Defendants' HHB Policy and related practices are unconstitutionally vague because they grant school officials unbridled discretion in deciding what constitutes "gender identity," "harassment," "harassment on the basis of gender identity," and "bullying," because they utilize terms that are inherently subjective and elude any precise or objective definition that would be consistent from one administrator, teacher, or student to another, because they are incapable of providing

meaningful guidance to Defendants and other school officials, and because they force teachers and students to guess whether expression that the U.S. Constitution protects is in fact allowed.

152.    Defendants' HHB Policy and related practices are unconstitutionally vague because they prohibit both "sexual harassment" and "harassment on the basis of gender identity" which, as defined by Defendants, are inherently in conflict.

153.    For example, by subjecting Blake Allen to the presence of a teenage male watching her while she is undressing in a private locker room, Defendants are subjecting her to "unwelcome conduct of a sexual nature," which constitutes "sexual harassment."

154.    Defendants' HHB Policy and related practices fail to provide a person of ordinary intelligence fair notice of what is prohibited and is so standardless that it authorizes discriminatory enforcement.

155.    The lack of objective criteria, factors, or standards in Defendants' HHB Policy and related practices renders these policies and practices unconstitutionally vague and in violation of Blake Allen's right to due process of law under the U.S. Constitution.

156.    Defendants' HHB Policy both facially and as applied violates the Due Process Clause of the Fourteenth Amendment.

157.    Defendants' actions caused injury to Blake Allen, including depriving her of her constitutional rights, loss of reputation, and pain, suffering, and emotional distress.

## FOURTH CAUSE OF ACTION
## UNCONSTITUTIONAL OVERBREADTH (42 U.S.C. § 1983)

158.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 119 of this Complaint.

159.    Defendants' HHB Policy violates the First Amendment's Free Speech Clause because it is facially overbroad.

160.    Defendants' definitions of "harassment" and "bullying" reach a substantial amount of constitutionally protected speech.

161.    By defining "harassment" to include a single "incident" of "verbal" conduct motivated by any of numerous characteristics, including "gender identity," that has the effect of creating an "offensive environment," among other things, Defendants can punish a substantial amount of constitutionally protected speech.

162.    By defining "harassment" to mean "conduct directed at the characteristics of a student's "gender identity," including "comments," Defendants can punish a substantial amount of constitutionally protected speech.

163.    By defining "bullying" to include "any overt act" that is "repeated over time" and "intended to ridicule, humiliate or intimidate" a student, among other things, Defendants can punish a substantial amount of constitutionally protected speech.

164.    The overbreadth of the relevant portions of the HHB Policy chills Blake Allen's speech.

165.    Because Defendants took adverse action against Blake Allen under the HHB Policy's definitions of "harassment" and "bullying," Defendants have unconstitutionally discriminated against her because she was engaged in protected expression.

166.    Defendants' HHB Policy and its enforcement of that policy are therefore unconstitutionally overbroad and violate Blake Allen's free speech rights under the First Amendment's Free Speech Clause.

167.    Defendants' HHB Policy both facially and as applied violates the Free Speech Clause of the First Amendment.

168.    Defendants' actions caused injury to Blake Allen, including depriving

24

her of her constitutional rights, loss of reputation, and pain, suffering, and emotional distress.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs ask this Court to enter judgment against Defendants and provide the following relief:

A. A declaratory judgment that Defendants' termination of Travis Allen's employment as middle school girls' soccer coach violated Travis's clearly established rights protected by the First and Fourteenth Amendments of the U.S. Constitution;

B. A declaratory judgment that Defendants' punishment of Blake Allen, including the requirements that she participate in a restorative circle, prepare a reflective essay, and serve out-of-school suspension, violated her clearly established rights protected by the First and Fourteenth Amendments of the U.S. Constitution;

C. A declaratory judgment that Defendants' HHB Policy is unconstitutionally vague and unenforceable on its face and as applied to Blake Allen;

D. A declaratory judgment that Defendants' HHB Policy is unconstitutionally overbroad and unenforceable on its face and as applied to Blake Allen;

E. A preliminary and permanent injunction ordering Defendants, their agents, officials, servants, employees, and any other persons acting on his behalf to:

    i. Reinstate Travis Allen as RUHS middle school girls' soccer coach;

    ii Refrain from taking further action against Travis Allen for having expressed his views on whether a trans-identifying male should be permitted to use the girls' locker room at a time when girls are using the room or would feel uncomfortable, including his reference to a male as a male and use of male pronouns;

    iii. Refrain from taking any action against Travis Allen for having initiated this action; and

25

    iv. Purge from any records in his possession, custody or control any reference to Travis's suspension as middle school girls' soccer coach;

  F. A preliminary and permanent injunction ordering Defendants, their agents, officials, servants, employees, and any other person acting on their behalf to:

    i. Rescind all disciplinary actions taken against Blake Allen on October 21, including without limitation the requirements that she participate in a restorative circle, prepare a reflective essay, and serve out-of-school suspension;

    ii. Refrain from taking further action against Blake Allen for having expressed her views on whether a trans-identifying male should be permitted to use the school locker room for girls at a time when such girls are using the room or would feel uncomfortable, including her reference to a male as a male and use of male pronouns;

    iii. Refrain from taking any action against Blake Allen for having participated in this action; and

    iv. Purge from any records in their possession, custody or control any reference to the HHB investigation of, or any disciplinary actions taken against, Blake Allen;

  G. A preliminary and permanent injunction prohibiting Defendants from enforcing the HHB Policy;

  H. Nominal and compensatory damages for the violation of Travis Allen's and Blake Allen's First and Fourteenth Amendment rights;

  I. Travis Allen's and Blake Allen's reasonable attorneys' fees, costs, and other disbursements pursuant to 42 U.S.C. § 1988; and

  J. Any other relief to which Travis Allen or Blake Allen may be entitled.

Dated: October 27, 2022                     Respectfully submitted,


                                            _____
                                            Anthony R. Duprey
                                            VT Bar No. 3204
                                            Duprey Law, PLLC
                                            11 Main Street, Suite B110F
                                            Vergennes, Vermont 05491
                                            Telephone: (802) 870-6563
                                            Fax: (802) 870-7231
                                            Anthony@DupreyLaw.com

                                            Tyson C. Langhofer*
                                            VA Bar No. 95204
                                            Philip A. Sechler*
                                            DC Bar No. 426358
                                            Mathew Hoffmann*
                                            DC Bar No. 1617417
                                            ALLIANCE DEFENDING FREEDOM
                                            44180 Riverside Pkwy
                                            Lansdowne, Virginia 20176
                                            Telephone: (571) 707-4655
                                            Facsimile: (571) 707-4656
                                            tlanghofer@adflegal.org
                                            psechler@ADFlegal.org
                                            mhoffmann@adflegal.org

                                            *Counsel for Plaintiffs*
                                            *Pro Hac Vice Application Forthcoming*


## DEMAND FOR TRIAL BY JURY

Plaintiffs Travis Allen and Blake Allen hereby demand a trial by jury for all issues so triable.


                                            _____
                                            Anthony R. Duprey
                                            *Counsel for Plaintiffs*

## DECLARATION UNDER PENALTY OF PERJURY

I, Travis Allen, a citizen of the United States and a resident of the State of Vermont, declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing Verified Complaint is true and correct to the best of my knowledge.

Executed this 26 day of October, 2022, at Randolph, Vermont.

_____
Plaintiff Travis Allen

## DECLARATION UNDER PENALTY OF PERJURY

I, Blake Allen, a citizen of the United States and a resident of the State of Vermont, declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing Verified Complaint is true and correct to the best of my knowledge.

Executed this 26 day of October, 2022, at Randolph, Vermont.

_____
Plaintiff Blake Allen

28